IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND T. CANDELA, | ) | CASE NO. 3:14-cv-01157 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Raymond T. Candela ("Plaintiff" or "Candela") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 15.   As explained more fully below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Candela protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on July 21, 2011.[1]  Tr. 11, 185-186, 187-197, 202.  He alleged a disability onset date of March 23, 2010.  Tr. 185, 187, 202.  He alleged disability due to a learning disability, herniated discs, depression, and acid reflux.  Tr. 89, 117, 143, 153, 215.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 7/22/2015).

Candela's applications were denied initially and upon reconsideration by the state agency.  Tr. 89-116, 117-142, 143-149, 153-165.  Candela requested an administrative hearing.  Tr. 166-168. On December 20, 2012, Administrative Law Judge Thomas L. Wang ("ALJ") conducted an administrative hearing.  Tr. 54-88.

In his January 24, 2013, decision, the ALJ determined that Candela had not been under a disability from March 23, 2010, through the date of the decision.  Tr. 8-25.  Candela requested review of the ALJ's decision by the Appeals Council.  Tr. 7.  On March 31, 2014, the Appeals Council denied Candela's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational and vocational evidence

Candela was born in 1978.  18, 185, 187.   He is married with three children, ages seventeen, fourteen, and nine at the time of the hearing.  Tr. 58.   Candela attended special education classes and completed school through 10th grade.  Tr. 59.  Candela previously worked as a janitor.  Tr. 79-80, 205.  He had not worked since March 23, 2010.  Tr. 60.

### B.    Medical evidence[2]

Following a February 8, 2010, injury at work, on February 25, 2010, Candela began receiving chiropractic treatment from Darren J. Holsten, D.C. ("Holsten").[3]  Tr. 332-333. Candela reported to Holsten that he was injured at work while lifting a 100-150 pound barrel of concrete.  Tr. 332.  Candela was working with light duty restrictions.  Tr. 332.  A February 8,

---

[2] Candela does not challenge the ALJ's findings regarding Candela's alleged mental impairments.  Accordingly, the medical evidence summarized herein pertains generally to his back impairment claim.

[3] During a July 2011 examination with Dr. Christopher D. Cannell, M.D., regarding his 2008 work-related injury, Candela reported that he had also been injured at work in 2007.  Tr. 283.  His 2007 injury was treated with physical therapy.  Tr. 283.  Candela indicated that he was still having intermittent low back and left leg pain at the time of his injury in 2008 and believed that the 2008 injury made his symptoms worse.  Tr. 283.

2010, lumbar spine MRI showed the possibility of "slight spondylitic change posteriorly at L5-S1." Tr. 342.  Otherwise, no major findings were detected.  Tr. 342.  Holsten's February 25, 2010, physical examination of Candela's lumbar spine showed: marked limitation in Candela's active range of motion; maneuvers[4] reproduced Candela's chief complaints; Candela's straight leg raise was positive on the left at 45 degrees;[5] there was hypoesthesia to light touch of Candela's L5-S1 dermatomes; except for Candela's left Achilles, his reflexes were intact; and Candela had +4/5 strength of left hip abduction, knee flexion and foot dorsiflexion.  Tr. 332. Holsten assessed lumbar sprain and strain. Tr. 332.

On April 13, 2010, Holsten indicated that Candela had returned to his office reporting a worsening of his low back and radicular left leg pain.  Tr. 330.  Candela had been performing light duty work but his condition had worsened.  Tr. 30. Based on the severity of Candela's complaints and Candela's inability to tolerate light duty work, Holsten reported that, upon his recommendation, Candela had been placed on temporary total disability, effective March 24, 2010.  Tr. 330.

A June 11, 2010, lumbar spine MRI showed no significant change in comparison to an earlier March 20, 2009, MRI.[6]  Tr. 268.  The June 11, 2010, MRI showed mild L4-5 disk space narrowing and disk desiccation.  Tr. 268.  Minor bulging disk was seen at the L3-4 level.  Tr.

---

[4] Holsten refers to Kemp's, Milgram's, and Valsalva maneuvers.  Tr. 332.  The Kemp test assists an examiner "in determining if a lateral or medial disk protrusion is present."
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2647081/#bib3 (last visited July 22, 2015).  The Milgram test is used to "detect space-occupying lesions and general spinal pathology."  "A positive [Milgram] test result occurs when the patient experiences lumbosacral pain indicating unspecified lumbosacral pathology."
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2647096/ (last visited July 20, 2015).  "The Valsalva maneuver (straining while holding the breath)" is a part of testing that "increase[s] intrathecal pressure . . . intended to detect space-occupying lesions in the . . . spine."  http://www ncbi.nlm.nih.gov/pmc/articles/PMC2647081/#bib3 (last visited July 22, 2015).

[5] In a straight leg-raising test, the patient lies down supine, fully extends the knee, and lifts the leg.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1900.  Leg pain when the leg is raised 30-90 degrees (a positive straight leg raise) indicates lumbar radiculopathy.  *Id*.

[6] The reading radiologist noted that the MRI study was "compromised by patient motion."  Tr. 268.

268.  Also, at the L4-5 level, moderate-sized broad based central protruding disk was seen,
causing some mild mass effect on the anterior thecal sac and mild bilateral lateral recess stenosis.
Tr. 268.  At the L5-S1 level, minor bulging disk was seen along with moderate arthropathy.  Tr.
268.  No significant central stenosis was observed.  Tr. 268.

Candella continued to receive chiropractic treatment from Holsten throughout 2010 and
2011.  Tr. 288-336.  On November 5, 2010, Holsten issued a report addressing "the issue of
substantial aggravation of preexisting L4-5 lumbar disc protrusion."  Tr. 296-297.  Holsten
disagreed with another physician's file review and reaffirmed his own prior reports from
February 25, 2010, and October 7, 2010, which he indicated demonstrated " both subjective
complaints and objective physical examination finding supporting a substantial aggravation of
the L4-5 disc protrusion."  Tr. 296.  Holsten indicated that "[f]urther evidence supporting said
aggravation is the injured worker's inability to tolerate even light duty employment at this time.
The fact that he was performing heavy lifting and was gainfully employed at the time of his
injury suggests the fact that his symptoms had resolved prior to his work injury on 2/8/10."  Tr.
296.  Shortly thereafter, on November 22, 2010, Holsten requested vocational rehabilitation
services for Candela to assist him with a return to gainful employment.  Tr. 295.

In December 2010, Holsten referred Candela to Dr. Christian L. Bonasso, M.D., of
Central Ohio Neurological Surgens, for evaluation of Candela's complaints of low back pain
and left lower extremity pain radiating into the top of his foot.  Tr. 273-274, 293.  Candela saw
Dr. Bonasso on January 5, 2011.  Tr. 273-274.  Dr. Bonasso noted that prior MRI scans showed a
midline to left-sided disc herniation at L4-L5 with slight disc space collapse.  Tr. 273.  Dr.
Bonasso's physical examination showed left dorsiflexor weakness at 3/5.  Tr. 273.  Otherwise,
his neurological examination was intact.  Tr. 273.  Dr. Bonasso assessed L4-L5 left-sided disc

herniation with disc space collapse, left lower extremity pain and dorisflexor weakness.  Tr. 273.

Dr. Bonasso discussed treatment options with Candela.  Tr. 273.  Candela indicated that he

wanted to save surgery as a last resort option.  Tr. 273.  Candela was interested in trying a round

of epidural steroid injections.  Tr. 273.  Lumbar scans were taken on January 5, 2011, showing

no evidence of instability but possible mild degenerative change at L4-L5 and L5-S1.  Tr. 345.

Also, upon Dr. Bonasso's referral, an EMG study was performed on February 1, 2011, showing a

chronic S1 radiculopathy on the left.  Tr. 269-270.

On February 20, 2011, Dr. Bonasso informed Holsten that Dr. Bonasso had had the

opportunity to review a recent MRI showing a broad-based disc bulge at L4-L5 and noted that

Candela had been treated for low back pain and left lower extremity pain and dorisflexor

weakness.  Tr. 272.  Dr. Bonasso indicated that an EMG showed a chronic S1 radiculopathy that

did not correlate to Candela's symptoms.  Tr. 272.  Dr. Bonasso also reported that Candela had

decided that he wanted to put the epidural injections on hold.  Tr. 272.

On March 24, 2011, upon referral from Dr. Bonasso, Dr. Gregory Figg, M.D., examined

Candela.  Tr. 280-282.  Candela described low back pain that radiated into his lower extremity

and into his foot on the left side.  Tr. 280.  His pain level was a 4/10 at that time, with his worst

pain level being 9/10.  Tr. 280.  He indicated that walking, bending and twisting made his pain

worse.  Tr. 280.  Mornings and bedtime were very painful.  Tr. 280.  Candela was sleeping six

hours per night but waking occasionally because of pain.  Tr. 280.  Candela reported that the

only medications he was taking were over-the-counter Prilosec and Ibuprofen or Aleve, as

needed.  Tr. 281.  He reported that physical therapy had been of minimal benefit.  Tr. 280.  On

physical examination, Candela had a positive straight leg test on the left; his reflexes were intact;

his strength was normal; and he was able to walk without difficulty.  Tr. 281.  Dr. Figg also

indicated that he saw no abnormality on Candela's sensory exam.  Tr. 281.  Following discussions regarding the risks and benefits of surgery and injections, Candela decided to proceed with a series of L5-S1 injections.  Tr. 281.

Candela received his first epidural steroid injection on April 4, 2011.  Tr. 278-279. Candela's first injection diminished his pain to a 2 or 3/10 and, on April 18, 2011, Candela received a second injection.  Tr. 276-277.

On June 23, 2011, Candela saw Holsten with complaints of intermittent chronic low back and left leg pain.  Tr. 289-290.  Candela reported that he was tolerating light to medium activities of daily living well.  Tr. 289.  Candela reported that his symptoms had "significantly improved post ESI [epidural steroid injections]."  Tr. 289.  Holsten performed a musculoskeletal orthopedic examination which showed limitation in Candela's lumbar range of motion by 25%. Tr. 289.  Holsten observed mild-moderate residual posterior lumbar myofascial rigidity and palpable tenderness.  Tr. 289.  Candela's nerve traction tests were unremarkable.  Tr. 289. Milgram and Valsalva's maneuvers reproduced Candela's complaints.  Tr. 289.  With the exception of left sided S1 dermatomal hypoesthesia to light touch, Candela's neurological examination was intact.  Tr. 289.  Holsten included a physical activity assessment indicating: "Walking 5/5, standing 5/5, sitting 5/5, transitional posture 4/5, bending 4/5, lifting 20 pounds, floor to waist 4/5, sleep 4/5.  Total score 31.35."  Tr. 290.  Holsten indicated that Candela's outcome potential was fair and Candela was "now medically stable to participate in a vocational rehabilitation program."  Tr. 290.

On July 5, 2011, Candela was seen by Dr. Christopher D. Cannell, M.D., of OrthoNeuro, in connection with his workers compensation claim stemming from his February 8, 2010, work-related injury.  Tr. 283-286.  Candela reported short-term relief from a series of two lumbar

epidural steroid injections.  Tr. 283.  Candela described his low back pain as being at a level of 5/10 to a 6/10 on a scale of 0 out of 10.  Tr. 284.  Candela indicated that his pain was both dull and sharp.  Tr. 284.  Candela felt the pain down his left leg to his ankle and foot with numbness and tingling 24 hours per day in his left little and fourth toes.  Tr. 284.  He reported that the pain in his leg was more bothersome than the pain in his low back and bending, lifting and twisting increased his low back pain.  Tr. 284.  He indicated that he was unable to sit, stand or walk for more than 15-20 minutes each at a time.  Tr. 284.  He was taking Tylenol and Ibuprofen for his pain and was not using any heat or ice.  Tr. 284.   Physical examination findings included a normal gait; normal strength in both legs; diminished senses in the left lower limb; reflexes were 2+ and equal at the ankles and patellae; no atrophy in the lower limbs; a negative straight leg test while in the supine and seated positions; reduced thoracic and lumbar range of motion limited by low back pain and muscle guarding; and tenderness over the multifidus triangle and lumbosacral paraspinal muscles.  Tr. 284-285.

Dr. Cannell opined that Candela had reached a level of maximum medical improvement for the allowed condition, noting that, for the allowed condition of lumbar sprain injury, Candela had received reasonable conservative care.[7]  Tr. 285.  Dr. Cannell opined that, due to Candela's persistent low back pain and lower left limb pain, Candela would be unable to return to his former work as a janitor that involved heavy lifting; frequent bending, stooping, and squatting; and prolonged standing and walking.  Tr. 285.   Dr. Cannell indicated that, "due solely to the allowed conditions of his claim," Candela would have the following functional limitations: lifting or carrying no more than 50 pounds occasionally and 25 pounds frequently; occasional bending, twisting, reaching below knee, pushing, pulling, squatting, standing; frequent sitting; and frequent overhead lifting.  Tr. 285-286.  Although Dr. Cannell found that Candela had

_____

[7] Candela also had an allowed condition for shoulder sprain.  Tr. 285.

reached maximum medical improvement, because it was not certain Candela could return to his work as a janitor, Dr. Cannell recommended vocational rehabilitation.  Tr. 286.  For Candela's allowed conditions,[8] Dr. Cannell recommended no further medical treatment other than continuing with Tylenol and Ibuprofen and a home exercise program.  Tr. 286.

On July 12, 2011, Holsten provided a letter regarding Candela's medical stability and the issue of vocational rehabilitation.  Tr. 288.  Holsten indicated that, following the administration of lumbar epidural steroid injections, Candela obtained "significant clinical improvement."  Tr. 288.  Holsten opined that Candela was medically stable and able to participate in a formal vocational rehabilitation plan.  Tr. 288.

On September 27, 2011, state agency reviewing physician Teresita Cruz, M.D., reviewed Candela's file and provided her opinion regarding Candela's physical impairments.  Tr. 95-101.  In reaching her opinion, Dr. Cruz considered Listing 1.04.  Tr. 95.  Dr. Cruz opined that Candela had the physical residual functional capacity to: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; push and/or pull unlimitedly, except as limited for lifting and/or carrying ability; occasionally climb ladders/ropes/scaffolds, stoop, crouch, and crawl; frequently kneel; and limited overhead reaching on the right.  Tr. 96-97.[9]

---

[8] Dr. Cannell noted that Candela had persistent low back pain and left leg pain likely due to a pre-existent and non-allowed condition of L4-L5 disc herniation.  Tr. 286.

[9] On February 6, 2012, as part of Candela's request for reconsideration of his claim, state agency reviewing physician Elizabeth Das, M.D., reviewed Candela's file and provided her opinion regarding Candela's physical impairments.  Tr. 122-125.  Dr. Das considered Listing 1.04 and her opinions were the same as those of Dr. Cruz.  Tr. 123-124.  As explanation for her RFC assessment, Dr. Das noted Candela's MRI evidence showing a moderate size broad based central L4-L5 disc protrusion resulting in mild central and mild bilateral recess stenosis.  Tr. 125.

Candela saw Holsten on November 21, 2011, complaining of progressively worsening low back and left lower extremity pain.  Tr. 376-377.  Upon physical examination, Holsten noted that Candela's active range of motion was limited by 50%.  Tr. 376.  There was moderate posterior lumbar paraspinal myofascial rigidity and palpable tenderness on the left more than the right.  Tr. 376.  A nerve traction test performed on the left reproduced Candela's chief complaints and other tests, including a straight leg raise test, were positive on the left.  Tr. 376. Candela's neurological examination showed hypoesthesia to light touch along the L5 area on the left.  Tr. 377.  With the exception of Candela's left hamstring, deep tendon reflexes were intact in the bilateral lower extremities.  Tr. 377.  Candela's motor strength was grossly intact in the bilateral lower extremities.  Tr. 377.  Holsten scheduled Candela for a left-sided L4-L5 epidural steroid injection.  Tr. 377.  Holsten maintained his opinion that Candela was clinically stable to participate in a vocational rehabilitation program.  Tr. 377.

On April 12, 2012, Candela saw Dr. Nikesh Batra, M.D., for assessment of his complaints of lower back pain.  Tr. 401-404.  Candela reported that, through his Bureau of Workers Compensation ("BWC") claim, he saw Dr. Bonasso for a surgical consult.  Tr. 403.  At that time, epidural steroid injections rather than surgery were recommended.  Tr. 403.  Candela reported getting some relief from two epidural steroid injections.  Tr. 403.  He reported having undergone physical therapy through the BWC but without much benefit.  Tr. 403.  Candela settled his BWC claim but was continuing to have significant pain in his lower back that went into his lower left extremity and sometimes into his ankle and toes.  Tr. 403.  Candela described his pain as sharp, stabbing, throbbing, and numbing, with his pain being present almost all the time.  Tr. 403.  Candela indicated that his pain was worse and prolonged standing, bending, walking, cold weather, and stretching aggravated his pain.  Tr. 403.  On physical examination,

Dr. Batra noted that Candela's gait was mildly antalgic.  Tr. 404.  He was able to walk on his toes but not his heels (especially on his left side).  Tr. 404.  Candela had a reduced range of motion in the lumbosacral spine and his paraspinal muscles were tender to palpation on both sides.  Tr. 404.  A straight leg raise on the left side caused Candela to experience pain in the left L5-S1.  Tr. 404.  Except for decreased strength with dorsiflexion, Candela's motor strength was otherwise within normal limits.  Tr. 404.  Candela's sensations to sharp pain on physical examination were within normal limits on both sides.  Tr. 404.  Candela's deep tendon reflexes were 1+ bilaterally symmetric.  Tr. 404.  Dr. Batra's impression was lumbar radiculitis; lumbar disc herniation; and lumbar spondylosis.  Tr. 404.  Dr. Batra prescribed Neurontin for Candela's pain and recommended further epidural steroid injections at the L4-L5.  Tr. 404.

Candela saw Dr. Batra for follow up after having received an epidural injection.  Tr. 400.  Candela reported having about 20% relief as a result of the injection but did not feel that the Neurontin was helping.  Tr. 400.  Candela indicated his pain level was a 3/10.  Tr. 400.  He had reduced lumbar range of motion.  Tr. 400.  His gait was normal and his straight leg raise was negative.  Tr. 400.

On September 1, 2012, Candela was seen at the emergency room following a trip and fall that occurred while he was at home resulting in an injury to his left little finger.  Tr. 405-408.  Candela was discharged in stable condition with a diagnosis of finger fracture.  Tr. 405.  On examination, Candela had a normal gait; his motor strength was 5/5 in all extremities; and his senses were grossly intact.  Tr. 406.  With the exception of his left fifth finger, Candela demonstrated full active range of motion in all extremities.  Tr. 406.  A September 11, 2012, x-ray showed that Candela's finger fracture was healing.  Tr. 409.

On September 20, 2012, Candela saw Dr. Batra.  Tr. 412.  Candela discussed with Dr. Batra his recent finger fracture.  Tr. 412.  Dr. Batra noted decreased lumbar range of motion with paraspinal tenderness and a positive straight leg raise test on the left.  Tr. 412.  Dr. Batra discussed options with Candela.  Tr. 412.  Candela indicated a desire to hold off on injections. Tr. 412.

## C.    Alleged "new" and "material" evidence

Candela seeks a sentence six remand under 42 U.S.C. 405(g) for the purpose of considering alleged new and material evidence.  Doc. 12, pp. 9-10, 18-21.  In particular, Candela seeks a remand for consideration of a Chronic Pain Residual Functional Capacity Questionnaire completed by Dr. Craig S. Thompson, M.D., on March 26, 2013.  Doc. 12, p. 19 (referencing Tr. 436-440).

On March 26, 2013, Dr. Thompson completed a Chronic Pain Residual Functional Capacity Questionnaire, wherein he indicated that he had been Candela's primary care physician for seven years.[10]  Tr. 436.  Dr. Thompson stated that Candela's diagnoses were lumbar degenerative disc disease; left lumbar radiculopathy; and cognitive disability.  Tr. 436.  Dr. Thompson indicated that Candela's symptoms included lumbar pain radiating into the left leg, causing falls; and poor understanding.  Tr. 436.  Dr. Thompson listed the following positive objective signs: reduced range of motion, sensory changes, reflex changes, and left leg muscle weakness.  Tr. 436.  Dr. Thompson opined that Candela could walk zero blocks without rest or severe pain; could sit continuously at one time for 1 hour and 10 minutes; could stand continuously at one time for 1 hour and 15 minutes; could sit and stand and/or walk for less than

---

[10] Dr. Thompson treated Candela for various complaints in 2011 and 2012.  *See e.g.,*Tr. 346-347 (May 26, 2011, follow up visit); Tr. 372-373 (October 3, 2011, GERD check-up (noting Candela was seeing Holsten for his back pain and had a worker's comp claim due to his back pain)); Tr. 391-393 (December 27, 2011, visit for GERD check-up); Tr. 384 (April 19, 2012, visit regarding upper GI scope that had been performed by gastroenterologist (noting Candela was seeing pain specialist for his low back pain)).

2 hours each in an 8-hour workday; would need the ability to shift positions at will from sitting, standing or walking; would need the ability to lie down at unpredictable intervals during a work shift; would need to use a cane or other assistive device while standing/walking; could never lift even less than 10 pounds; had significant limitations in reaching, handling or fingering; could perform grasping, fine manipulation, and reaching 70% of the workday; could not bend and twist at the waist; and would miss work more than three times each month.  Tr. 437-439.

**D.      Testimonial evidence**

    **1.      Candela's testimony**

Candela was represented and testified at the administrative hearing.  Tr. 57-78.   Candela explained that he had alleged a disability onset date of March 23, 2010, because on that date, he was at work, carrying bags of trash and slipped and fell down steps.  Tr. 58, 60.  He was unconscious and taken to the emergency room.  Tr. 58.  He had been receiving workers' compensation for his work-related injury until around September of 2012.  Tr. 60, 77-78.

Candela estimated seeing his physician every two months for pain in his lower back and down into his left leg and toes.  Tr. 60.  He indicated that he also has tingling in his toes.  Tr. 60. Candela indicated he was limited in his ability to walk, stand and sit.  Tr. 61.  He has to take periodic rest breaks when walking.  Tr. 61.  Candela's left leg gives out every now and then.  Tr. 63-64, 74.  About two months prior to the hearing, his leg had given out on him and he fell down his basement stairs and broke his little finger.  Tr. 63.  He estimated being able to stand about 10 minutes at a time before needing to sit and rest and being able to sit for about an hour before needing to stand up.  Tr. 61-62, 69-70.  His doctors have restricted him to lifting no more than 20 pounds.  Tr. 63, 69.  In light of the lifting restriction, Candela does not really lift anything, other

than maybe a loaf of bread.  70.  Also, he is unable to reach below his knees, lift above his shoulder, and cannot twist and turn.  Tr. 63.

As far as medication, Candela takes Neurontin twice a day, Ultram three times a day, and Ibuprofen twice a day.  Tr. 62.  Candela gets some relief from his medication but the pain is still present.  Tr. 69.  His medication makes him drowsy.  Tr. 75.  Candela estimated taking an hour to an hour-and-a-half long nap about three to four times each week.  Tr. 75-76.  He has received injections in his back.  Tr. 63-65.  Candela indicated that the injections helped some for a short period of time.  Tr. 65.  Candela reported some good and some bad days but he does not generally have a lot of consecutive good days.  Tr. 65-66.  Candela wears a back brace, which was prescribed for him as part of his workers' compensation claim.  Tr. 67.  He wears the brace continuously, including when sleeping.  Tr. 67.  The brace helps him move around so he does not get so stiff.  Tr. 67.  Cold weather aggravates Candela's back pain.  Tr. 77.

Although he occasionally drives short distances, his wife usually drives.  Tr. 68, 72-73.  While his wife is at work, he tries to pick up around the house and might vacuum a few times each month.  Tr. 71.  However, after vacuuming for about 6 or 7 minutes, he has to sit and rest for about 30 to 40 minutes.  Tr. 71-72.  Also, after doing dishes for about 10 minutes, he has to sit down and rest.  Tr. 71.  Candela does not do the laundry or yard work.  Tr. 72.  He might go to the grocery store with his wife but has problems getting around the store and has to take breaks.  Tr. 73.  Therefore, he often waits in the car while his wife is doing the shopping.  Tr. 73.

### 2.      Vocational Expert's testimony

Vocational Expert ("VE") Lynn Kaufman testified at the hearing.  Tr. 78-86.  The VE summarized Candela's past relevant work as a janitor, indicating that the work was unskilled work and Candela had performed the work at two different strength levels, medium and heavy.

Tr. 79-80.  The ALJ asked the VE a series of hypothetical questions (Tr. 80-84), including a hypothetical that asked the VE to assume an individual capable of light work with the following limitations: foot control operation limited to frequent with the left leg, left foot; able to perform postural limitations occasionally; limited to frequent overhead reaching with the right hand but unlimited with the left hand; avoidance of concentrated exposure to extreme cold; limited to simple, routine, and repetitive tasks; off-task 5% of the day; and limited to work with no production rate or pace work.  Tr. 82-83.  The VE indicated that the described individual would be unable to perform Candela's past relevant work but there would be light, unskilled work that the described individual could perform, including (1) cashier, with 1,000 such positions available in the region, 26,000 statewide, and 540,000 nationwide; (2) light cleaning position, with 400 such positions available in the region, 7,500 statewide, and 200,000 nationwide; and (3) light packing position, with 250 such positions available in the region, 5,000 statewide, and 130,000 nationwide.  Tr. 82-83.

Following the ALJ's inquiry, counsel for Candela proceeded to ask the VE questions.  Tr. 84-86.  During that questioning, Candela indicated a need to stand because his lower back was hurting.  Tr. 84.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[11] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[12] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[13] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[11] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[13] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his January 24, 2013, decision, the ALJ made the following findings:[14]

1.    Candela met the insured status requirements through September 30, 2015.  Tr. 13.

2.    Candela had not engaged in substantial gainful activity since March 23, 2010, his alleged onset date of disability.  Tr. 13.

3.    Candela had the following severe impairments: degenerative disease of the lumbosacral spine with radiculopathy; affective disorders; and borderline intellectual functioning.[15]  Tr. 13-14.

4.    Candela did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, including 1.04, *Disorders of the Spine*.  Tr. 14-16.

5.    Candela had the RFC to perform light work subject to the following limitations: no more than frequent operation of left foot controls (i.e., no more than two-thirds of the workday); no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling; no more than frequent overhead reaching with his right upper extremity; no concentrated exposure to extreme cold; limited to simple, routine, repetitive tasks in a work environment without production rate or pace work; and off-task five percent of the workday.  Tr. 16-18.

6.    Candela was unable to perform past relevant work.  Tr. 18.

7.    Candela was born in 1978 and was 34 years old, defined as a younger individual at all times relevant to the decision.  Tr. 18.

8.    Candela had a limited education and was able to communicate in English.  Tr. 18.

---

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[14] The ALJ's findings are summarized.

[15] The ALJ found other impairments, including gastrointestinal-related complaints; fractured left little finger; and sleep apnea to be non-severe impairments.  Tr. 14.

9.  Transferability of job skills was not material to the determination of disability.  Tr. 18.

10.  Considering Candela's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Candela could perform, including cashier, cleaner, and packer.  Tr. 18-19.

Based on the foregoing, the ALJ determined that Candela had not been under a disability from March 23, 2010, through the date of decision.  Tr. 19.

## V. Parties' Arguments

### A.  Plaintiff's arguments

First, Candela argues that the ALJ erred at Step Three when he determined that Candela's back impairment did not meet or equal Listing 1.04A, which pertains to disorders of the spine. Doc. 12, pp. 11-14.

Next, Candela argues that the RFC was not supported by substantial evidence because (1) the ALJ impliedly gave the opinions of Dr. Teresita Cruz, M.D., Dr. Elizabeth Das, M.D., and Dr. Christopher D. Cannell, M.D., reduced or no weight and improperly substituted his own judgment for that of the physicians; (2) the ALJ's reliance on a notation in the file that Candela benefited from epidural steroid injections was improper because Candela receiving only short-term relief from the injections; and (3) the ALJ erred by selectively relying on a September 2012 "normal" physical examination finding to support his RFC finding.  Doc. 12, pp. 15-18.

Lastly, Candela argues that the Court should remand his case pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of a Chronic Pain Residual Functional Capacity questionnaire completed by Dr. Craig S. Thompson, M.D.,  on March 26, 2013 (Tr. 436-440), after the December 20, 2012, administrative hearing (Tr. 54) and after the issuance of the ALJ's January 24, 2013, decision (Tr. 8-25).  Doc. 12, pp. 18-21.

### B.  Defendant's arguments

In response, the Commissioner contends that the ALJ reasonably determined that Candela's back impairment did not meet the criteria of Listing 1.04A, arguing that the ALJ's Step Three determination is supported by the opinions of state agency reviewing physicians and the records do not reflect nerve root compression and/or simultaneous abnormalities in strength and senses or reflexes.  Doc. 13, pp. 6-7.

With respect to Candela's challenge to the RFC, the Commissioner argues that the ALJ did not impliedly give no weight to the opinions of Drs. Cruz, Das, and Cannell, contending that, other than restricting Candela to light, rather than medium work, the ALJ's RFC assessment closely resembled the opinions of Drs. Cruz, Das, and Cannell.  Doc. 13, pp. 7-8.  The Commissioner also argues that the ALJ properly discounted Candela's allegations of limitations greater than those contained in the RFC because those allegations were inconsistent with conservative treatment and largely normal physical findings as late as September 2012 and the ALJ was not required to discuss every piece of evidence.  Doc. 13, pp. 8-9.

In response to Candela's request for a sentence six remand for consideration of evidence not presented to the ALJ, the Commissioner argues that Candela has failed to meet his burden of demonstrating "good cause" for not acquiring and presenting the alleged new and material evidence to the ALJ.  Doc. 13, pp. 9-10.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.      The ALJ's Step Three analysis is sufficiently explained and supported by substantial evidence**

Candela argues that reversal and remand is warranted because the ALJ erred in failing to find that his back impairment met or equaled Listing 1.04A.  Doc. 12, pp. 11-15.

At Step Three, an ALJ considers whether the claimant has an impairment that meets or equals one of the listings in the Listing of Impairments.  20 C.F.R. §404.1520(a)(4)(iii).  A claimant must meet all of the specified medical criteria to show that his impairment matches an impairment in the Listings; an impairment that establishes only some of those criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  To demonstrate a listing level impairment under Listing 1.04A, a claimant must show he has a disorder "of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:"

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 1.04A.

"An administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listing Impairment." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 415 (6th Cir. 2011).  However, "it is the claimant's burden to show that he meets or medically equals an impairment in the Listings." *Todd v. Astrue*, 2012 WL 2576435, * 9 (N.D. Ohio 2012) (internal citations omitted), *report and recommendation adopted*, 2012 WL 2576282 (N.D. Ohio 2012).

Candela claims that the ALJ provided insufficient reasoning as to why he concluded that Candela's impairments did not meet or equal Listing 1.04A.  This claim is without merit because the ALJ made clear that there was insufficient medical evidence to support a finding that Candela's impairment met or equaled a Listing, including Listing 1.04, stating at Step Three:

Consistent with the opinions of the Ohio Bureau of Disability Determination (BDD) reviewing doctors (Exhibits 1A, 2A, 5A, and 6A), the claimant's impairments, both severe and non-severe, when considered singly or in combination, do not meet or equal the level of severity described in the Listings of Impairments in Appendix 1 to Subpart P of Regulations No. 4.  There is no medical opinion of record to indicate the existence of an impairment or combination of impairments that meet or equal in severity the level of the Listings of Impairments.

More specifically, the claimant's impairments, whether considered alone or in combination, do not meet or equal the criteria in any section of Listing 1.00 for musculoskeletal impairments.  Although he has degenerative disease, he does not have the neurological deficits, nerve root compression, spinal arachnoiditis or lumbar spinal stenosis described in Section 1.04 of the Listing of Impairments.

Tr. 14.

The foregoing demonstrates that the ALJ did in fact consider and discuss his rationale for finding that Listing 1.04 was not satisfied and the ALJ's analysis is sufficient to allow this Court to conduct a meaningful judicial review and to conclude that the ALJ's Step Three findings are supported by substantial evidence.  The ALJ determined that, among other criteria of Listing 1.04 that were not met or equaled, Candela was unable to show evidence of nerve root compression.  Tr. 14.  In reaching his decision, the ALJ relied upon the opinions of state agency reviewing physicians who did not find a listing level impairment.  Tr. 14.  The ALJ also noted that there were no medical opinions of record indicating the existence of an impairment or combination of impairments that met or equaled the severity of a Listing.  Tr. 14.

Candela nonetheless argues that the medical evidence shows that his impairment meets or equals Listing 1.04A.  Doc. 12, pp. 12-15.  For example, Candela claims that a June 2010 MRI indicating a mass effect on the anterior thecal sac and spinal stenosis and a February 2011 EMG study showing a chronic S1 radiculopathy on the left satisfy the "resulting in compression of a nerve root or the spinal cord" portion of Listing 1.04A.  Doc. 12, p. 13.  Candela's interpretation of the foregoing evidence, however, is not supported by opinion evidence from a medical provider finding that Candela's impairment or combination of impairments meets or equals Listing 1.04A.  In contrast, in reaching his Step Three decision, the ALJ relied upon the opinions of state agency reviewing physicians who reviewed the record and concluded that Candela's impairments did not meet or equal a Listing.  Tr. 14 (referencing Exhibits 1A (Tr. 89-101), 2A (Tr. 102-114), 5A (Tr. 117-128), 6A (Tr. 129-14)).  Furthermore, the ALJ considered and discussed the medical evidence that Candela points to in support of his claim that there is evidence of compression of the nerve root or spinal cord.  *See* Tr. 14  (ALJ's discussion of the June 2010 MRI and February 2011 EMG study as part of his Step Two analysis).

Notwithstanding this evidence, the ALJ determined at Step Three that there was no evidence of nerve root compression.  Tr. 14.

Since the ALJ considered and weighed the evidence and explained his Step Three determination, Candela's argument that he has an impairment or combination of impairments that meets or equals Listing 1.04A amounts to a request that the Court reweigh the evidence, which the Court may not do.  *See Garner*, 745 F.2d 383, 387 (6th Cir. 1984) (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."). Further, even if the Court found that the evidence cited by Candela supports his claim that he has a listing level impairment, reversal is not permitted because there is also substantial evidence to support the ALJ's Step Three finding, i.e., the state agency reviewing physician opinions.  *Jones, 336 F.3d at 477* ("if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ," the Commissioner's decision cannot be overturned).

**B.**     **The  ALJ's RFC assessment is supported by substantial evidence**

Candela argues that the RFC was not supported by substantial evidence because (1) the ALJ impliedly gave the opinions of Dr. Teresita Cruz, M.D., Dr. Elizabeth Das, M.D., and Dr. Christopher D. Cannell, M.D., reduced or no weight and improperly substituted his own judgment for that of the physicians; (2) the ALJ's reliance on a notation in the file that Candela benefited from epidural steroid injections was improper because Candela receiving only short-term relief from the injections; and (3) the ALJ erred by selectively relying on a September 2012 "normal" physical examination finding to support his RFC finding.  Doc. 12, pp. 15-18.

The opinions of Drs. Cruz, Das and Cannell are not treating source opinions subject to treating physician rule analysis.  Nonetheless, the ALJ explained his consideration and

evaluation of the opinions of Drs. Cruz, Das and Cannell. Tr. 17. For example, as discussed

above, the ALJ considered and relied upon the opinions of Drs. Cruz and Das at Step Three. Tr.

14. Further, as part of his RFC assessment analysis, the ALJ considered the opinions of Drs.

Cruz, Das and Cannell, stating:

> Although February 2010 right shoulder and clavicle x-rays revealed normal findings (Exhibit 8F, pp. 4, 5), he should avoid more than frequent overhead reaching with his right upper extremity as a reasonable precaution, which is consistent with the limitation indicated by BDD physicians Teresita Cruz, M.D., and Elizabeth Das, M.D. (Exhibits 1A, 2A, 5A and 6A).
>
> ***
>
> Although Dr. Cruz (Exhibits 1A and 2A), Dr. Das (5A and 6A) and Christopher Cannell, M.D., a specialist in physical Medicine and Rehabilitation who performed an independent medical examination (6F), all indicated that the claimant could perform a range of medium exertional work, I find that electrodiagnostic testing confirms lumbosacral radiculopathy that would reasonable [sic] limit the claimant to a range of light exertional work with the above-enumerated limitations. However, any further limitations would be out of proportion to the objective evidence of record.

Tr. 17.

Candela's claim that the ALJ's failure to explicitly state the weight assigned to the

opinions of Drs. Cruz, Das and Cannell serves as a basis for reversal or remand is without merit.

While the ALJ did not explicitly assign weight, consistent with 20 C.F.R. § 404.1527(c), the ALJ

considered the opinions and discussed, among other matters, the supportability and consistency

of those opinions with the evidence (Tr. 14, 17). *See e.g., Reeves v. Comm'r of Soc. Sec.*, 2015

WL 4231600, *6 (6th Cir. July 13, 2015) (finding no error where the ALJ did not assign a

particular weight to a non-treating physician's opinion).

Candela's claim that the ALJ impliedly gave reduced or no weight to the opinions of Drs.

Cruz, Das, and Cannell and therefore substituted his own judgment for that of the physicians

who had provided opinion evidence is also without merit. The Regulations make clear that a

claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. § 404.1545(a); 20 C.F.R. § 404.1546(c).  "[T]he ALJ—not a physician—ultimately determines a Plaintiff's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010).  Further, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009).  Consistent with the Regulations, when assessing Candela's RFC, the ALJ considered the medical opinion evidence as well as Candela's subjective complaints, treatment history, diagnostic studies, activities of daily living, and medical opinion evidence.  Tr.  14, 17-18.

Candela takes issue with the ALJ's reliance on evidence indicating that Candela noticed improvement following epidural steroid injections, arguing that he only received short-term benefit from those injections and experienced worsening pain after the injections and even fell due to his leg giving out.   Doc. 12, p. 16.  Candela also takes issue with the ALJ's reliance on a September 2012 physical examination showing normal motor strength in all extremities, intact sensation and a normal gait, arguing that the record relied upon pertains to an emergency room treatment for a broken finger and the ALJ "cherry-picked" the evidence and did not discuss a lot of other evidence showing abnormal physical examination findings.  Doc. 12, pp. 16-17.   As discussed below, the ALJ's consideration of the foregoing evidence does not warrant reversal or remand.

The ALJ accurately noted that Candela's treating chiropractor stated in June 2011 that Candela's symptoms improved significantly following epidural steroid injections (Tr. 17, 289) and accurately summarized September 2012 examination findings revealing normal motor

24

strength, intact sensation, and a normal gait (Tr. 17, 406).  Although Candela did not claim to have obtained 100% relief from the epidural steroid injections, it was proper for the ALJ to take into consideration Candela's response to treatment when evaluating the severity of his symptoms.  *See* 20 C.F.R. § 404.1529(c )(3).  Also, although the emergency room record pertains to treatment for a broken finger, the physical examination results are nonetheless relevant evidence relating to the extent and nature of Candela's impairment.  Further, the ALJ did not consider those records alone when reaching his decision.  For example, among other evidence, the ALJ relied upon Candela's generally conservative treatment (Tr. 18), including recommendations for diet and exercise, epidural steroid injections, and chiropractic care (Tr. 14, 17).  The ALJ also considered Candela's reports of activities of daily living, including attending social events, cookouts, camping, doing laundry, and shopping with assistance, which the ALJ found not consistent with the level and persistence of symptoms as alleged by Candela.  Tr. 18.

With respect to Candela's claim that reversal and remand is warranted because the ALJ "cherry-picked" the evidence or did not discuss all of the evidence, the Sixth Circuit has noted that the so-called cherry picking of evidence by the ALJ "can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir.2009). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted). Also, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart,* 114 Fed. Appx. 727, 733 (6th Cir. 2004).

Furthermore, Candela has not presented medical opinion evidence indicating that the abnormal medical findings he claims the ALJ ignored warrant functional restrictions beyond those assessed by the ALJ.  The records that Candela contends the ALJ ignored do not demonstrate that the ALJ's decision is not supported by substantial evidence.  For example, Candela points to abnormal examination findings contained in a June 23, 2011, record from Holsten, his treating chiropractor.  Doc. 12, p. 17 (referencing Tr. 289 ("On 6/23/11 Dr. Holsten indicated that Mr. Candela had left-sided S1 dermatomal hypoesthesia to light touch."). Notwithstanding this examination finding, on June 23, 2011, Candela stated he was "tolerating light to medium ADL's well."  Tr. 289.   Additionally, on that same date, Holsten indicated that Candela was able to lift 20 pounds and was "now medically stable to participate in a vocational rehabilitation program."[16]  Tr. 290.   Candela also points to Dr. Cannell's July 5, 2011, examination finding that Candela's sensation to pinprick and light touch and vibration was diminished throughout his entire left lower limb.  Doc. 12, pp. 17-18 (referencing Tr. 284). However, Dr. Cannell's examination findings on that same date also included normal findings as well, i.e., normal gait, normal strength in both legs; no weakness; no atrophy in the lower limbs; and straight leg raise test was negative in the supine and seated positions.  Tr. 284-285.

For the reasons discussed above, Candela has failed to demonstrate that the ALJ improperly considered the evidence and/or has failed to demonstrate that the ALJ's RFC assessment is not supported by substantial evidence.   Accordingly, reversal and remand is not warranted.

## C.    A sentence six remand is not warranted

Candela has requested that this Court remand his case for consideration of a Chronic Pain Residual Functional Capacity questionnaire completed by Dr. Craig S. Thompson, M.D.,  on

---

[16] Holsten reaffirmed this opinion on July 12, 2011 (Tr. 288), and on November 21, 2011 (Tr. 377).

March 26, 2013 (Tr. 436-440), after the December 20, 2012, administrative hearing (Tr. 54) and after the ALJ's January 24, 2013, decision (Tr. 8-25).

The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the evidence presented to the ALJ.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  The statute permits only two types of remand: a sentence four remand made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision; and a sentence six remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006). The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it only can consider such evidence in determining whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

The plaintiff has the burden under sentence six of 42 U.S.C. § 405(g) to demonstrate that the evidence he now presents in support of a remand is "new" and "material," and that there was "good cause" for his failure to present this evidence in the prior proceeding.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit materials and that the evidence was "material.").

Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding."  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied).  "[E]vidence is *material* only if there is a reasonable probability

27

that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (internal quotations and citations omitted and emphasis supplied) "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* (internal quotations and citations omitted and emphasis supplied).

Dr. Thompson's March 26, 2013, Chronic Pain Residual Functional Capacity questionnaire (Tr. 436-440) post-dates both the December 20, 2012, administrative hearing (Tr. 54) and the ALJ's January 24, 2013, decision (Tr. 8-25). Candela claims that the "new" and "good cause" requirements are not at issue because the evidence was not available to him until March 26, 2013, when Dr. Thompson completed the form. Doc. 12, p. 19. However, "[t]he mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Comm'r of Soc. Sec.*, 479 Fed. Appx. 713, 725 (6th Cir. 2012). The Sixth Circuit takes a harder line on the good cause requirement, indicating that "in order to show good cause the complainant must give a valid reason for his failure to obtain the evidence prior to the hearing." *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)(relying on *Willis v. Secretary of Health and Human Services*, 727 F.2d 551, 554 (6th Cir. 1986)); *see also Courter*, 479 Fed. Appx. at 725 (quoting *Oliver*, 804 F.2d at 966). Candela has offered no reason why he was unable to obtain a functional capacity opinion from Dr. Thompson, his "long-time primary care physician" (Doc. 12, p. 19), prior to the administrative hearing.

Accordingly, because Candela has not demonstrated "good cause" for the submission of Dr. Thompson's March 26, 2013, Chronic Pain Residual Functional Capacity questionnaire after

the administrative hearing and issuance of the ALJ's decision, Candela's request for a sentence six remand fails.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

July 27, 2015

_____

Kathleen B. Burke
United States Magistrate Judge